FILED
Friday, 06 August, 2004 04:48:48 PM
Clerk, U.S. District Court, ILCD

FILED

AUG 0 6 2004

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| E. BERGMAN CO. d/b/a BORDER MAGIC®, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO.  04-  **04-2154** |
| | ) | |
| KECK HOMES LLC and KEN KECK | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

NOW COMES the Plaintiff, E. BERGMAN CO. d/b/a BORDER MAGIC®, an Illinois

Corporation, by and through its attorney, DODD & BARTELL, P.C., and complains of

Defendants, KECK HOMES LLC and KEN KECK, as follows:

### JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to 28 USC §§1331, 1332, 1367, and under the

Trademark Act of 1946 (15 U.S.C. § 1051 et seq.). Additionally, this Court has diversity

jurisdiction given that the amount in controversy exceeds $75,000 and all parties have diverse

citizenship.

2. The trademarks and other marks are owned by Plaintiff, whose principal place of

business is Rantoul, Illinois, fixing the propriety of the venue in the Urbana Division of the

United States District Court for the Central District of Illinois. Further, the contract upon which

supplemental jurisdiction is based specifies the obligations of the parties under agreements that

are performable in Champaign County, Illinois.

## PARTIES

3. Plaintiff, E. BERGMAN CO., is an Illinois corporation, with its principal offices in Rantoul, Champaign County, Illinois, doing business as Border Magic®.

4. Defendant, KECK HOMES LLC is a limited liability company under the laws of the State of Missouri with its principal offices in the State of Missouri.

5. Defendant, KEN KECK, individually, is and was at all times relevant herein a resident of the State of Missouri.

## FACTUAL ALLEGATIONS

6. Plaintiff, at great expense and effort, has created and developed a proprietary "BORDER MAGIC METHOD" to install custom concrete curbing, trim and borders utilizing a proprietary "BORDER MAGIC MACHINE."

7. Since 1997, Plaintiff has continuously distributed and sold, and now is selling its products and methods throughout the United States under its trademark BORDER MAGIC®.

8. As a result of Plaintiff's sales and advertising of its methods and products under its trademark, BORDER MAGIC®, as described above, and as a result of the widespread use and acceptance of the product and method by the public, the product and method have come to be and now is, well and favorably known to the public under the trademark, BORDER MAGIC®, and that trademark has become distinctive for Plaintiff's methods and products sold in commerce. Plaintiff has established goodwill in connection with its business, which goodwill the public associates with Plaintiff's trademark, BORDER MAGIC®.

9. On or about April 28, 2001, Plaintiff and Robert Burden, entered into an Dealership Agreement, a copy of which is attached hereto marked Exhibit "A" and incorporated herein by

-2-

this reference thereto, whereby Defendant, leased and/or purchased certain equipment from the

Plaintiff.

10. On or about the same date, in conjunction with said Agreement, Plaintiff and Ken

Keck Homes, entered into a Trademark License Agreement, a copy of which is attached hereto

marked Exhibit "B" and incorporated herein by this reference thereto. Said Agreement grants the

Defendant certain rights to utilize the trademarks and processes developed by the Plaintiff

providing certain obligations are met.

11. Said agreements were entered into and executed in Rantoul, Champaign County,

Illinois.

12. A) The Dealership Agreement provides in part that:

"1.1. Assets Conveyed. On the closing date, as herein defined, Company shall:

A. Lease one new Border Magic® machine to the for use in the custom curbing business under the trademark name of Border Magic® as provided in Paragraph 1.4.

B. Grant the right to act as a Dealer under the BORDER MAGIC® trademark during the term of this Agreement in the Territory described in Exhibit A.

C. Grant a license to use the trademark BORDER MAGIC® under a separate Trademark License Agreement as further defined in Paragraph 1.5.

D. Sell additional equipment to the Dealer related to the custom curbing business identified in a separate invoice provided to the Dealer."

"1.6. Ownership. The BORDER MAGIC® machine is, and shall at all time be and remain, the sole and exclusive property of the Company. The Dealer shall have no right, title, or interest therein, except as expressly set forth in this Agreement. If te Company is dissolved, the Dealer shall receive title to the border machine under lease to said Dealer."

"5.3. Territorial Limitations. The Dealer may contract for jobs only within the Territory, except with permission of the Company, which will be granted only

-3-

under unique conditions. The Dealer shall not open a business, or otherwise establish a business similar to or the same as that sold by Company to Dealer outside of the Territory. In addition, Dealer shall not indicate in any form of advertising that he has a custom curbing or similar operation located outside of the Territory."

"6.3.    Dealer's Responsibilities.

...C.    The Dealer shall keep the BORDER MAGIC ® machine insured against all risk of loss or damage from any cause whatsoever for not less than the full replacement value thereof as determined by the Company.

"6.6. Expiration of Agreement. A. At the expiration of the term of this agreement, the Dealer shall be responsible for the delivery of the BORDER MAGIC® machine to a place designated by the Company."

"Section 7.    Events Constituting Dealer Default. The Company may terminate this agreement immediately upon the occurrence of any of the following events:

A.    The Dealer fails to pay when due any of the payments, or to perform, or rectify breach of, any obligation assumed by the Dealer in this agreement.

...C.    The Dealer or his assigns ceases to do business for more than 90 days under the name BORDER MAGIC®."

"Section 8.    Rights and Remedies of the Company upon Default. Upon the occurrence of any of the events of default described in Paragraph 7 and at any time thereafter, the Company may in its discretion exercise any one or all of the following rights or remedies:

A.    To accelerate all the payments described herein and declare them immediately due and payable.

B.    The Dealer shall be liable to the Company for an amount equal to the sum of the payments accelerated pursuant to Subsection A immediately above; said sum is to be immediately due and payable as liquidated damages and not as a penalty.

C.    To require the Dealer to assemble BORDER MAGIC® machine at the Dealer's expense, and make it available to the Company at a place to be designated by the Company. The Company may enter the premises of the Dealer for the purpose of peacefully exercising the rights of the Company set forth in this subsection.

      D.     Terminate this Dealership Agreement, the Trademark License Agreement, together with all rights of the Dealer to the use of the trademark BORDER MAGIC®, and all rights to the territory assigned hereunder."

(B) The terms of the Trademark License Agreement provides in part:

"1. GRANT OF LICENSE. Owner grants to User a nonexclusive, nontransferable license to use the Marks in its name and in connection only goods and services sold in User's business of providing custom curbing and only from a business location and to customers within the Territory as defined below, and User accepts the License subject to the following terms and conditions."

"2. The Territory is defined as the following county(ies) in the State of Kansas and Missouri, Kansas 1/5 of Johnson and Wyandotte; Missouri 1/5 of Platt, Clay and Jackson."

"10. TERMINATION FOR CAUSE. Owner shall have the right to terminate this agreement upon thirty (30) days written notice to User in the event any affirmative act of insolvency by User, or upon the appointment of any receiver or trustee to take possession of the properties of User or upon the winding-up sale, consolidation, merger or any sequestration by governmental authority of User, or upon breach by Users of any of the provisions of this Agreement or of the Dealership Agreement."

13. Defendant, Keck Homes LLC is the "Dealer" and "User" under said Agreements

and the Plaintiff is the "Company" and "Owner" under said Agreements.

14. Defendant, Ken Keck, was the Guarantor under the following language contained in

the Dealership Agreement:

"Guarantor unconditionally, except as otherwise defined herein, guarantees the

fulfillment of all terms of the Agreement, including the payment of all monies due to the

Company, arising from any failure of the Dealer to fulfill the terms of the Agreement."

15. On May 14, 2004, Plaintiff notified the Defendants that the Dealership Agreement

and Trademark License Agreement were terminated due to the breach of the same by the Dealer.

16. The Plaintiff has demanded the return of the equipment, materials and any and all

-5-

other items with the trademark, BORDER MAGIC®, on it by the Defendants, but the
Defendants have failed and refused to do so.

## COUNT I - TRADEMARK INFRINGEMENT

17. Plaintiff repeats and realleges each and every averment contained in Paragraphs 1
through 16 as though set forth here in full.

18. With actual notice of Plaintiff's federal registration and rights to the trademark
BORDER MAGIC®, Defendants are using in commerce Plaintiff's trademarks and trademark
rights in such manner as is likely to cause confusion among consumers that the businesses are
affiliated.

19. Since termination of the Dealership Agreement and Trademark Agreement on or
about May 14, 2004, the Defendants have had no right to claim or represent themselves as
having an affiliation with E. Bergman Co. or its authorized dealers and franchisees, nor have the
Defendants had the consent of the Plaintiff to use its trademark.

20. The Defendants have undertaken its wrongful and fraudulent activities with the
intent to cause confusion and mistake among, and to deceive and defraud, the public and
purchasers and consumers of BORDER MAGIC® products.

21. The use of the BORDER MAGIC® trademark by the Defendants constitutes
trademark infringement and has caused and will continue to cause confusion to or mistake by or
deception of purchasers and consumers as to the source or origin of any concrete curbing
distributed or sold by the Defendants, and as to the existence of an affiliation between the
Plaintiff and the Defendants, all to the irreparable damage of the Plaintiff.

22. The Plaintiff has demanded that the Defendants desist from its unlawful conduct,

-6-

2:04-cv-02154-MPM-DGB  # 1   Page 7 of 26

but the Defendants have not done so.

23. The Defendants' conduct constitutes a violation of 15 U.S.C.A. §§1051-1127 and, in particular, 15 U.S.C.A. §1114.

24. The Defendants' conduct has caused and will continue to cause irreparable injury to the Plaintiff unless restrained by this Court. Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays that this Court enter judgment for Plaintiff and against Defendants as for Count I of the Plaintiffs's Complaint as follows:

1. Enjoining Defendants and their agents and employees from the infringing use of the trademark, BORDER MAGIC®;

2. Requiring delivery to Plaintiff by Defendants of all articles bearing the BORDER MAGIC® trademark or similar designations;

3. Directing Defendants to report to the Court after an appropriate interval regarding progress in carrying out the Court's order;

4. Ordering an accounting of any income derived by the Defendants resulting from or in any way related to the infringement of the trademark, BORDER MAGIC®;

5. Ordering Defendants to pay Plaintiff's attorneys' fees and costs in connection with this matter; and

6. Directing such other and further relief as this Court deems just and appropriate.

## COUNT II - FEDERAL UNFAIR COMPETITION

25. Plaintiff repeats and realleges each and every averment contained in Paragraphs 1 through 24as though set forth here in full.

26. The Defendants are soliciting and are attempting to sell and has sold, concrete

-7-

· curbing of unknown origins to customers and potential customers of BORDER MAGIC®
products and, in the course thereof, Defendants have misrepresented such products to be
BORDER MAGIC® products and itself to be an authorized dealer of BORDER MAGIC®.

27. The Defendants' misrepresentations and the use of BORDER MAGIC® trademark
by the Defendants constitute a false designation of the origin of the materials and processes sold
by the Defendants and a false description and representation of the same. Such
misrepresentations and use of the trademarks have caused and will continue to cause confusion
to or mistake by or deception of purchasers and consumers as to the source or origin of the
concrete curbing and processes thereby utilized to create such curbing.

28. The Defendants' wrongful and fraudulent activities were undertaken with the intent
to deceive and defraud the public and purchasers and consumers of concrete curbing.

29. The Defendants' conduct constitutes a violation of 15 U.S.C.A. §§1051-1127 and, in
particular, 15 U.S.C.A. §1125.

30. The Defendants' conduct has caused and will continue to cause irreparable injury to
the Plaintiff unless restrained by this Court. The Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays that this Court enter judgment for Plaintiff and against
Defendants as for Count II of the Plaintiffs's Complaint as follows:

1. Enjoining Defendants and their agents and employees from the infringing use of the
trademark, BORDER MAGIC®;

2. Requiring delivery to Plaintiff by Defendants of all articles bearing the BORDER
MAGIC® trademark or similar designations;

3. Directing Defendants to report to the Court after an appropriate interval regarding

-8-

progress in carrying out the Court's order;

4. Ordering an accounting of any income derived by the Defendants resulting from or in any way related to the infringement of the trademark, BORDER MAGIC®;

5. Ordering Defendants to pay Plaintiff's attorneys' fees and costs in connection with this matter; and

6. Directing such other and further relief as this Court deems just and appropriate.

## COUNT III: DETINUE

31. Plaintiff repeats and realleges each and every averment contained in Paragraphs 1 through 30as though set forth here in full.

32. The predecessor in interest of Defendant Estate received the right to use a BORDER MAGIC® curb laying machine during the effective period of the Dealership Agreement. This machine is manufactured by the Plaintiff for the specific purposes of facilitating the use of the proprietary BORDER MAGIC® processes, systems, and trademark by authorized dealers and franchisees.

33. Section 1.6 of the Dealership Agreement holds as follows:

> "1.6.  Ownership.  The BORDER MAGIC® machine is, and shall at all time be and remain, the sole and exclusive property of the Company. The Dealer shall have no right, title, or interest therein, except as expressly set forth in this Agreement. If the Company is adjudged a bankrupt or becomes insolvent and the Company is dissolved, the Dealer shall receive title to the border machine under lease to said Dealer."

34. Upon termination, the Defendants' right of possession to the BORDER MAGIC® curb laying machine automatically ceases.

35. The Plaintiff has demanded the Defendants return said machine. The Defendants

-9-

have refused the Plaintiff's demand.

36. The value of said goods and chattels is approximately $2,500.00.

37. The Plaintiff claims a return of said goods and $10,000 for their detention.

WHEREFORE, Plaintiff prays that this Court enter judgment for Plaintiff and against

Defendants as for Count III of the Plaintiff's Complaint as follows:

1. Ordering the Defendants to deliver the BORDER MAGIC® curb laying machine to

the Plaintiff's place of business in good condition;

2. Ordering the Defendants to pay $10,000 in damages to the Plaintiff for wrongful

detention;

3. Ordering the Defendants to pay Plaintiff's attorneys' fees and costs; and

4. Directing such other and further relief as this Court deems just and appropriate.

## COUNT IV - BREACH OF CONTRACT

38. Plaintiff repeats and realleges each and every averment contained in Paragraphs 1

through 37 as though set forth here in full.

39. The Plaintiff is informed and believes that the Defendants have ceased doing

business for more than 90 days in violation of the Dealership Agreement.

40. The Defendants have failed to pay its annual license fee as required by the

Dealership Agreement.

41. The Plaintiff is informed and believes that Defendants have failed to maintain

insurance on the BORDER MAGIC® machine as required by the Dealership Agreement.

42. The Plaintiff has terminated the Dealership Agreement and License Agreement due

to the breach of the Agreements by Defendants. In addition, the term of these Agreements has

now expired without being renewed.

43. The Plaintiff has fully performed all of its obligations.

44. Section 8 of the Dealership Agreement holds:

"Section 8.    Rights and Remedies of the Company upon Default. Upon the occurrence of any of the events of default described in Paragraph 7 and at any time thereafter, the Company may in its discretion exercise any one or all of the following rights or remedies:

A.    To accelerate all the payments described herein and declare them immediately due and payable.

B.    The Dealer shall be liable to the Company for an amount equal to the sum of the payments accelerated pursuant to Subsection A immediately above; said sum is to be immediately due and payable as liquidated damages and not as a penalty.

C.    To require the Dealer to assemble BORDER MAGIC® machine at the Dealer's expense, and make it available to the Company at a place to be designated by the Company. The Company may enter the premises of the Dealer for the purpose of peacefully exercising the rights of the Company set forth in this subsection.

D.    Terminate this Dealership Agreement, the Trademark License Agreement, together with all rights of the Dealer to the use of the trademark BORDER MAGIC®, and all rights to the territory assigned hereunder."

45. Section 5 of the Dealership Agreement holds in part:

"5.4. Non-Competition. The Dealer shall not, directly or indirectly, engage in, be employed in, or have any interest in any business similar to or the same as that sold by Company to Dealer. The Dealer shall not, nor in concert with anyone else, attempt to manufacture or sell any curb-laying machine; nor compete with Company, directly or indirectly, in any way, including, without limitation, alone or as a member of a partnership, stockholder, creditor, consultant or representative of a competitive company during the period of the Trademark License Agreement and for a period of five years commencing on the effective date on which Dealer ceases to conduct the curb-laying business; or in any case attempt to infringe upon the trademark or trade name BORDER MAGIC®, the trade secrets of the Company or any patent rights of the Company. The Dealer agrees that in addition to its other remedies, the Company shall be entitled to

-11-

injunctive relief including, but not limited to permanent injunctions to restrain or enjoin any violation of this restrictive covenant by the Dealer."

46. As a direct and proximate result of the Defendants' breach of the Franchise Agreement, the Plaintiff has suffered damages; including but not limited to:

1) License fees for use of the Plaintiff's trademark; and

2) Damages as a result of the Defendants competing against the Plaintiff;

3) Attorneys fees and costs.

WHEREFORE, Plaintiff prays that this Court enter judgment for Plaintiff and against Defendants as for Count IV of the Plaintiff's Complaint as follows:

1. Enjoining Defendants from conducting a competing curb-laying business for a period of five years commencing on the termination date;

2. Ordering an accounting of any profits derived by the Defendants resulting from their wrongful competition in the curb-laying business after termination;

3. Ordering Defendants to pay the license fees owed under the Franchise Agreement;

4. Ordering Defendants to pay Plaintiff's attorneys' fees and costs; and

5. Directing such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

Dodd & Bartell, P.C.

By: _____
Jason S. Bartell, A member of the firm

ATTORNEYS FOR THE PLAINTIFF
303 S. Mattis Ave., Suite 201
Champaign, IL 61821
Tel.: (217)356-6363
Facsimile: (217)355-1358

-12-

EXHIBIT "A"

Form NB August 31, 2001                    DEALERSHIP AGREEMENT

This Agreement is entered into this _28_ day of _April_____ A.D. 2001, by and between
E. BERGMAN CO. d/b/a **BORDER MAGIC®**, ("Company"), 1503 CR 2700 N, Rantoul, IL, 61866 and
_Keck Homes LLC_____ ("Dealer") of _Blue Springs, MO._____.

WHEREAS, the Company is the owner of **BORDER MAGIC®** machine, used in the custom
curbing business and the trademark **BORDER MAGIC®**; and

WHEREAS, the Dealer wishes to establish a dealership using the **BORDER MAGIC®** trademark
and **BORDER MAGIC®** machine; and

WHEREAS, the Dealer wishes to obtain from the Company, and the Company desires to (a) grant
a license to use the trademark **BORDER MAGIC®** within a limited Territory, (b) lease to the Dealer, on the
terms and conditions hereinafter set forth, a **BORDER MAGIC®** machine, and (c) provide certain services
for the establishment of a custom curbing business.

NOW THEREFORE, IT IS AGREED AS FOLLOWS:

Section 1    Transfer of Rights; Liabilities Assumed.

1.1.    Assets Conveyed. On the closing date, as herein defined, the Company shall :

A.  Lease one new **BORDER MAGIC®** machine to the Dealer for use in the custom curbing
business under the trademark name of **BORDER MAGIC®** as provided in Paragraph1.4.

B. Grant the right to act as a Dealer under the **BORDER MAGIC®** trademark during the term of
this Agreement in the Territory described in Exhibit A.

C.  Grant a license to use the trademark **BORDER MAGIC®** under a separate Trademark
License Agreement as further defined in Paragraph 1.5.

D.  Sell additional equipment to the Dealer related to the custom curbing business identified in a
separate invoice provided to the Dealer.

1.2.    Price.

The price for the Trademark License, Lease of a **BORDER MAGIC®** machine and purchase of
additional equipment and services shall be Fiftynine thousand nineDollars ($ 59,900.00
plus applicable State Sales Tax, to be paid by cash or cashier's check as follows:hundred

A. Ten Thousand_____ Dollars ($10,000.00) on execution of this
Agreement.

B.    The balance of the price shall be paid to the Company by the Dealer at closing, together
with the delivery of the new **BORDER MAGIC®** machine and additional equipment.

1.3.    Other Agreements. At Closing, the parties shall execute the following additional
agreements:

A.    All appropriate documents that will effect a transfer of the applicable Assets.

      **B.**      Release of all UCC Financing Statements applicable to the Assets being transferred hereunder.

      **C.**      The Trademark License Agreement for the use of the BORDER MAGIC® trademark .

    **1.4.**    <u>Terms for BORDER MAGIC® Machine Lease</u>.  As part of this Agreement, the Company hereby leases to the Dealer one **BORDER MAGIC®** machine for the term of five years from the date of this Agreement for use in the custom curbing business under the trademark name of **BORDER MAGIC®**. Provided the Dealer is current on all accounts with the Company at time of renewal, beginning in the sixth anniversary of this Agreement, the Dealer may extend the term for the lease of the **BORDER MAGIC®** machine by payment of one dollar per year on the anniversary date of the Agreement.

    **1.5.**    <u>Terms of License Agreement</u>.  The right to use of the **BORDER MAGIC®** trademark shall be for one year from the date of this Agreement.  Provided the Dealer is current on all accounts with the Company at time of renewal, beginning on the first anniversary date of this Agreement the Dealer may extend the License Agreement and the territorial rights granted in this Agreement for an additional five years.  The Dealer shall provide written notice of extension to the Company in person or by United States registered or certified mail at least 90 days prior to expiration of the Agreement and shall pay to the Company the sum of Five thousand dollars ($5,000.00) in five equal yearly payments of One thousand dollars ($1,000.00), each payment to be made on the anniversary date of the Agreement.

    Provided the Dealer is current on all accounts with the Company on the sixth anniversary date and every five years thereafter, the Dealer may extend the term of the Agreement for additional five year periods upon written notice of extension to the Company in person or by United States registered or certified mail at least 90 days prior to expiration of the period of renewal and payment  to the Company of the sum of five thousand dollars ($5,000.00) in five equal yearly payments, each payment to be made on the anniversary date of the Agreement, increased for the ensuing five-year period in the same proportion that the Consumer Price Index for Urban Wage Earners and Clerical Workers-United States City Average: All items-Series A (1967-100), for the last month of the just expired five-year period shall be increased over the said index figure for the first month of the lease term.

    **1.6.**    <u>Ownership</u>.  The **BORDER MAGIC®** machine is, and shall at all times be and remain, the sole and exclusive property of the Company.  The Dealer shall have no right, title, or interest therein, except as expressly set forth in this  Agreement.  If the Company is adjudged a bankrupt or becomes insolvent and the Company is dissolved, the Dealer shall receive title to the border machine under lease to said the Dealer.

    **1.7.**    <u>Maintenance</u>.  The Dealer shall be responsible for all maintenance to the **BORDER MAGIC®** machine.

    **1.8.**    <u>Replacement BORDER MAGIC® Machine</u>.  If the Dealer requires a replacement **BORDER MAGIC®** machine after the expiration of the warranty period stated in this Agreement,  the Dealer may lease a replacement **BORDER MAGIC®** machine at  the Company's cost plus ten percent (10%) upon written request to the Company at least 90 days prior to delivery.

    <u>Section 2</u>    <u>The Company's Representations and Warranties</u>.  The Company represents and warrants to the Dealer as follows:

    **2.1.**    <u>Corporate Organization and Authorization</u>.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of the state of its incorporation, has full corporate power and authority to carry on its business as it is now being conducted and to own or lease the assets it now owns or leases, and is duly qualified and licensed to do business as a foreign corporation in good

standing in each jurisdiction in which the conduct of its business or the ownership of its property requires such qualification or licensing. It has full corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by this Agreement. The Company does not have any subsidiaries.

2.2.    Title to Assets.  The Company warrants that it is the sole owner of the Assets with full right to lease, sell or convey it as the Company may choose, and that the Company holds good and marketable title to the Assets, free and clear of restrictions on or conditions to lease, transfer or assignment, and free and clear of liens, pledges, charges, or encumbrances.

2.3.    Transfer Not Subject to Encumbrances or Third-Party Approval.  The execution and delivery of this Agreement by the Company, and the consummation of the contemplated transactions will not result in the creation or imposition of any valid lien, charge, or encumbrance on any of the Assets, and will not require the authorization, consent, or approval of any third party, including any governmental subdivision or regulatory agency.

2.4.    Brokers and Finders.  The Company has not employed any broker or finder in connection with the transactions contemplated by this Agreement, or taken action that would give rise to a valid claim against any party for a brokerage commission, finder's fee, or other like payment.

2.5.    Litigation.  The Company has no knowledge of any claim, litigation, proceeding, or investigation pending or threatened against the Company that might result in any material adverse change in the business or condition of Assets being conveyed under this Agreement.

2.6.    Accuracy of Representations and Warranties.  None of the representations or warranties of the Company contain or will contain any untrue statement of a material fact or omit or will omit or misstate a material fact necessary in order to make the statements in this Agreement not misleading.

Section 3.    Representations of the Dealer.  The Dealer represents and warrants that none of the representations or warranties of the Dealer contain or will contain any untrue statement of a material fact or omit or will omit or misstate a material fact necessary in order to make the statements contained herein not misleading.

Section 4.    Covenants of the Company.

4.1.    Warranties.  The Company guarantees the **BORDER MAGIC®** machine against any defects in workmanship and materials from the date of receipt by the Dealer under normal use and service for a period of one year

The Company shall transfer to the Dealer all warranties provided by any manufacturer for the **BORDER MAGIC®** machine and all other equipment which has been transferred to the Dealer under this Agreement.

Any warranty is void in cases of damage in transit, negligence, abuse, abnormal usage, misuse, accidents or improper maintenance.  Any liability hereunder is further conditioned upon the return of such defective equipment, with all transportation charges prepaid in accordance with the Company's instructions, to the manufacturer's factory or other place designated by the Company, within 30 days from the date of the equipment's failure. Upon return to the factory, the Company or the manufacturer shall examine such product and shall, in its sole judgment, determine whether the alleged defect actually exists.

No warranty shall extend to any equipment, product or parts thereof which have been subjected to any modification, misuse, neglect, accident, incorrect servicing, or used in validation of the manufacturer's or the Company's instructions.

**THE WARRANTIES CONTAINED IN THE AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY REGARDING MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE, ARISING OUT OF OR IN CONNECTION WITH THE SALE OF THE EQUIPMENT, ITS DELIVERY, USE OR PERFORMANCE.**

4.2.    Cooperation.    The Company shall cooperate with the Dealer in the conduct of the Dealer's business in the following manner:

A.    The Company shall provide a maximum of 16 hours of training and assistance as needed in the conduct of the Dealer's custom curbing operation for the purpose of providing the Dealer with information as to the correct method of placing the custom curbing as well as the method of troweling the curbing and as well as the cutting of the seams in the product as it is curing.

B.    The Dealer and the Company shall execute the Trademark License attached hereto.

C.    The Company shall assist in protecting the Territory of the Dealer from violation by any other BORDER MAGIC® the Dealer after receipt of notice of violation from the Dealer and verification of the continuance of such violation. The Company's obligation hereunder is limited to providing notice of correction to the offending the Dealer and, at the Company's sole option, declaring a default under the offending the Dealer's Agreement.

4.3.    Covenant Not to Compete. Absent the Dealer's loss of all rights to use the trademark **BORDER MAGIC®**, the Company covenants with the Dealer that for a period of five (5) years from the date of closing of this Agreement, the Company will not enter into a Dealership Agreement or Trademark License Agreement with any other Dealer, nor shall it directly or indirectly, engage in, be employed in, or have any interest in any occupation or business similar to or the same as that sold by the Company to the Dealer, within the Territory as defined in Exhibit A.

Section 5.    Covenants of the Dealer.

5.1.    Conditions and Best Efforts. The Dealer will use its best efforts to effectuate the transactions contemplated by this Agreement and to fulfill all the conditions of the Dealer's obligations under this Agreement, and shall do all acts and things as may be required to carry out the Dealer's obligations and to consummate this Agreement.

5.2.    Termination of Business. The limitations concerning territory and non-competition by the Company shall terminate if the Dealer or its assigns ceases to do business for more than 90 days under the name BORDER MAGIC®. Or if the Company terminates this Agreement under the provisions of Section 7. Evidence of failure to do business shall include the failure to promote Border Magic® for a period of 90 days.

5.3.    Territorial Limitations. The Dealer may contract for jobs only within the Territory, except with permission of the Company, which will be granted only under unique conditions. The Dealer shall not open a business, or otherwise establish a business similar to or the same as that sold by the Company to the Dealer outside of the Territory. In addition, the Dealer shall not indicate in any form of advertising that he has a custom curbing or similar operation located outside of the Territory.

5.4.    Non-Competition. The Dealer shall not, directly or indirectly, engage in, be employed in, or have any interest in any business similar to or the same as that sold by the Company to the Dealer. The Dealer shall not, nor in concert with anyone else, attempt to manufacture or sell any curblaying

machine; nor compete with the Company, directly or indirectly, in any way, including, without limitation, alone or as a member of a partnership, stockholder, creditor, consultant or representative of a competitive Company during the period of the Trademark License Agreement and for a period of five years commencing on the effective data on which the Dealer ceases to conduct the curb-laying business; or in any case attempt to infringe upon the trademark or trade name BORDER MAGIC®, the trade secrets of the Company or any patent rights of the Company. The Dealer agrees that in addition to its other remedies, the Company shall be entitled to injunctive relief including, but not limited to permanent injunctions to restrain or enjoin any violation of this restrictive covenant by the Dealer.

5.5.    Non-Disclosure.  The Dealer acknowledges having access to certain proprietary information from the Company regarding its trade secrets, the BORDER MAGIC® machine, the design of the machine, the patterns created by the machine, marketing strategies, and other confidential information.  The Dealer agrees not to disclose this information to others for any reason except in dealing with the Company except to the employees.  The Dealer shall obtain from each employee a non-disclosure and non-competition agreement in accordance with the terms of this Agreement

Section 6.    Lease Terms.  The leased BORDER MAGIC® machine shall be subject to the following terms and conditions:

6.1.    Location of BORDER MAGIC® machine:.  The BORDER MAGIC® machine shall be located at the address furnished in paragraph 10.2 during the entire term of this agreement.  The Dealer shall notify the Company of any change of address in writing at time of change of business location.

6.2.    Uniform Commercial Code.  At the request of the Company, the Dealer will join the Company in executing one or more financing statements, pursuant to the Uniform Commercial Code or other registration law applicable to the location of the BORDER MAGIC® machine and/or the Dealer, in a form satisfactory to the Company. The Dealer will pay the cost of filing the financing statements in all public offices wherever filing is deemed by the Company to be necessary or desirable.

6.3.    The Dealer's Responsibilities.

A. The Dealer acknowledges that it has the care, custody, and control of the BORDER MAGIC® machine and accepts responsibility for the BORDER MAGIC® machine at all times except when it is being physically handled by the employees of the Company.  The Dealer, therefore, expressly agrees to defend, indemnify and hold the Company harmless from and against any and all claims for loss of or damage to property, injury to or death of any person or persons, including attorneys fees resulting from or arising in any manner out of the Dealer's use, operation, or possession of any of the equipment furnished under this Agreement. The Dealer is not responsible or liable for damages or injuries resulting from a manufacturer's defect in the design or operation of the BORDER MAGIC® machine.

B. The Dealer shall keep the BORDER MAGIC® machine free of all liens, taxes, encumbrances and seizure or levy; shall not use same illegally, shall not damage, abuse, misuse, abandon or lose said BORDER MAGIC® machine; shall not part with possession thereof, whether voluntarily or involuntarily, or transfer any interest therein.

C. The Dealer shall keep the BORDER MAGIC® machine insured against all risk of loss or damage from any cause whatsoever for not less than the full replacement value thereof as determined by the Company.

D. The Dealer shall be responsible for and pay the cost of all necessary repairs, maintenance, and replacements, and the Company shall not be obligated to, nor called upon by the Dealer to furnish or make or pay for any repairs to or upon the BORDER MAGIC® machine (except under the provisions of

the warranty referred to in Paragraph 8), and all replacement parts, additions, repairs and accessories incorporated in or affixed to the BORDER MAGIC® machine shall become a part thereof, and the title therein shall vest in the Company.

E. During the term of this Agreement, the Dealer, at its cost and expense, will use said BORDER MAGIC® machine in a careful and prudent manner, keeping the same in good repair, properly lubricated, properly housed when not in use, and operated only by competent operators; will promptly pay all necessary license and registration fees and taxes assessed or charged thereon or for the use thereof; will repair all damage done thereto in the use or operation of said BORDER MAGIC® machine; will comply with and conform to all laws and regulations relating to the ownership, possession, use or maintenance of the BORDER MAGIC® machine, and save the Company harmless against actual or asserted violations; and will not use said BORDER MAGIC® machine for any other purpose than in the conduct of its business.

F. At all times, the Dealer shall maintain the identification BORDER MAGIC® as originally disclosed on the BORDER MAGIC® machine and the additional equipment sold under this Agreement as long as said additional equipment is used as part of the cost them curbing business under the trademark BORDER MAGIC®, disclosing the interest of the Company in the BORDER MAGIC® machine and trademark.

G. At the time of the annual licensing renewal, the Dealer shall provide the Company information as to work performed under this Agreement, including the address, pictures of five jobs per year and invoices of twenty completed jobs per year.

6.4.    Right of Inspection. The Company shall have the right at any time to enter the premises occupied by the BORDER MAGIC® machine and shall be given free access thereto and afforded necessary facilities for the purpose of inspection.

6.5.    Expiration of Agreement. A. At the expiration of the term of this agreement, the Dealer shall be responsible for the delivery of the BORDER MAGIC® machine to a place designated by the Company.

B. At its option, the Company may enter the premises of the Dealer for the purpose of effecting the removal of the BORDER MAGIC® machine to the location designated by the Company. If the Company exercises this option, the Dealer shall be responsible for the costs associated with the removal of the BORDER MAGIC® machine to the location designated by the Company.

6.6.    Liability. The Dealer assumes all risks and will pay all costs and expenses of any character arising from the use, possession or maintenance of said BORDER MAGIC® trademark and the use of the BORDER MAGIC® machine and agrees to indemnify and save harmless the Company from any and all loss or damage or claims for loss or damage (including attorney's fees) for injury to or death of persons or property, including loss of use, caused by said BORDER MAGIC® machine, or arising out of the use, possession or maintenance of the BORDER MAGIC® trademark or machine, and to give immediate written notice to the Company of any such loss or damage, or loss of possession of said BORDER MAGIC® machine occasioned by any cause whatsoever.

6.7.    Destruction or Damage. If the BORDER MAGIC® machine hereby leased is destroyed, lost or stolen, the Dealer shall not be relieved of its obligation make all payments required herein for the full term of this Agreement. Any sum paid to the Company from insurance on such BORDER MAGIC® machine shall be applied to the payment of the accrued and thereafter accruing hereunder. If the leased BORDER MAGIC® machine is damaged, there shall be no reduction in the payments due hereunder, and

the Dealer shall immediately have such damage repaired at its cost and expense, subject to the recovery of any insurance proceeds which will be applied to the cost of repairs or replacement. The Dealer shall not be responsible for any claims arising from manufacturing defects.

Section 7.    Events Constituting the Dealer Default.  The Company may terminate this agreement immediately upon the occurrence of any of the following events:

A.  The Dealer fails to pay when due any of the payments, or to perform, or rectify breach of, any obligation assumed by the Dealer in this agreement.

B.  The Dealer makes an assignment for benefit of creditors, or is subject to any receivership, insolvency or bankruptcy proceedings.

C.  The Dealer or his assigns ceases to do business for more than 90 days under the name BORDER MAGIC®.

D.  Repeated customer complaints which are unresolved by the Dealer within a reasonable time after written notice from the Company.

E.  Any other event which causes the Company in good faith to deem itself insecure.

Section 8.  Rights and Remedies of the Company upon Default.  Upon the occurrence of any of the events of default described in Paragraph 7 and at any time thereafter, the Company may in its discretion exercise any one or all of the following rights or remedies:

A.  To accelerate all the payments described herein and declare them immediately due and payable.

B.  The Dealer shall be liable to the Company for an amount equal to the sum of the payments accelerated pursuant to Subsection A immediately above; said sum to be immediately due and payable as liquidated damages and not as a penalty.

C.  To require the Dealer to assemble BORDER MAGIC® machine at the Dealer's expense, and make it available to the Company at a place to be designated by the Company.  The Company may enter the premises of the Dealer for the purpose of peacefully exercising the rights of the Company set forth in this subsection.

D.  Terminate this Dealership Agreement, the Trademark License Agreement, together with all rights of the Dealer to the use of the trademark BORDER MAGIC®, and all rights to the territory assigned hereunder.

Section 9.    The Dealer's Acceptance.  The Dealer represents and acknowledges that it has entered into this Agreement on the basis of its own examination, personal knowledge, and opinion of the value of the business and has not relied upon the Company for such decision.

Section 10.    Indemnification and Survival.

10.1.    Survival of Representations and Warranties.  All representations and warranties made in this Agreement shall survive the Closing of this Agreement, except that any party to whom a representation or warranty has been made in this Agreement shall be deemed to have waived any misrepresentation or breach of representation or warranty of which such party had knowledge prior to

Closing. Any party learning of a misrepresentation or breach of representation or warranty under this Agreement shall immediately give written notice thereof to all other parties to this Agreement.

10.2.    Indemnification.    The Dealer expressly agrees to defend, indemnify and hold the Company harmless from and against any and all claims for loss of or damage to property, injury to or death of any person or persons resulting from or arising in any manner out of the negligent use, operation, or possession by the Dealer or the Dealer's employee or agent of any of the Assets transferred under this Agreement.   The Dealer is not responsible or liable for damages or injuries resulting from a manufacturer's defect in the design or operation of the BORDER MAGIC® machine.

The Dealer shall carry public liability and property damage insurance covering the use of the BORDER MAGIC® trademark and machine in amounts not less than ONE MILLION DOLLARS ($1,000,000.00) for any single claim, and THREE MILLION DOLLARS ($3,000,000.00) in the aggregate, including property damage.  All said insurance shall be in the form and amount and with companies approved by the Company, and shall be in the joint names of the Company and the Dealer, insuring both the Company and the Dealer jointly and individually.  The Dealer shall pay the premiums therefor and shall deliver said policies, or duplicates thereof, to the Company.  Each insurer shall agree, by endorsement on the policy issued by it or by independent instrument furnished to the Company, that it will give the Company thirty (30) days written notice before the policy in question shall be altered or canceled.  The proceeds of such insurance, at the option of the Company, shall be applied toward payment of the Dealer's obligations hereunder.  The Dealer hereby appoints the Company as the Dealer's attorney-in-fact to make claim for, receive payment of, and execute and endorse all documents, checks, or drafts for loss or damage under any said insurance policy.

10.3.    Transfer to Third Party.    The Dealer may not sell, lease, convey or transfer any rights in the BORDER MAGIC® machine or any other rights under this Agreement to a third party without written approval of the Company.    The Company reserves the right to reject any third party transfer less the proposed Dealer meets the Company's requirements for a dealership. The proposed Dealer, prior to transfer of any rights, must enter into written agreements with the Company as to the Territory and the Trademark License. A transferee shall be required to accept and acknowledge all the terms and conditions contained in this Agreement. The Dealer shall pay to the Company the sum of $350.00 plus any out of pocket expenses incurred by the Company in cooperating in any transfer of the Trademark License.  In addition, there is a training fee for the new Dealer of $500.00.

Upon final approval by the Company of a transfer to a third party, the original Dealer shall have no liability as to any claims or obligations arising after the date of transfer.

Section 11.    Closing.

11.1.    Time and Place.  This Agreement shall be closed on or before _____, 20___, at 1503 C.R. 2700 N, Rantoul, Illinois, or at such other locations as the parties may agree.

11.2.    Obligations of the Company at the Closing.  At the Closing the Company shall deliver to the Dealer all assets, including a Bill of Sale covering the equipment sold hereunder.

11.3    Obligations of the Dealer at the Closing.  The Dealer shall have executed all the documents necessary under the terms of this Agreement, including the Trademark License, and shall pay all sums due and owing in cash or cashiers check.

Section 12.    Miscellaneous Provisions.

12.1.    Amendment and Modification. Subject to applicable law, this Agreement may be amended, modified, or supplemented only by a written agreement signed by all of the parties hereto.

12.2.    Independent Contractor. The Dealer shall be and at all times shall remain an independent contractor and shall at no time be considered an employee of the Company.

12.3.    Notices. All notices, requests, demands, and other communications required or permitted hereunder will be in writing and will be deemed to have been duly given when delivered by hand or two days after being mailed by certified or registered mail, return receipt requested, with postage prepaid:

If to the Company to:                    Copy to:

E. Bergman Co.                           Robert W. Dodd
c/o Eldean Bergman                       DODD & McCLELLAN, P.C.
1503 C.R. 2700 N.                        303 S. Mattis Avenue, Suite 201
Rantoul, IL 61866                        Champaign, IL 61821-3051

or to such other person or address as the Company furnishes to the Dealer pursuant to the above.

If to the Dealer to:                     Copy to:

_____                    _____
_____                    _____

or to such other address as the Dealer may furnish to the Company pursuant to the above.

12.4.    Attorney Fees. In the event an arbitration, suit or action is brought by any party under this Agreement to enforce any of its terms, or in any appeal therefrom, it is agreed that the prevailing party shall be entitled to reasonable attorneys fees to be fixed by the arbitrator, trial court, and/or appellate court.

12.5.    Parties Bound. This Agreement shall be construed under and in accordance with the laws of the State of Illinois, and all obligations of the parties created hereunder are performable in Champaign, Champaign County, Illinois.

12.6.    Computation of Time. In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall be included, unless it is a Saturday, Sunday or a legal holiday, in which event the period shall begin to run on the next day which is not a Saturday, Sunday or legal holiday.

12.7.    Titles and Captions. All section titles or captions contained in this Agreement are for convenience only and shall not be deemed part of the context nor affect the interpretation of this Agreement.

12.8.    Pronouns and Plurals. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

12.9.    Entire Agreement. This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements among them respecting the

subject matter of this Agreement. Any amendments to this Agreement must be in writing and signed by the party against whom enforcement of that amendment is sought.

12.10. Agreement Binding. This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

12.11. Presumption. This Agreement or any Section thereof shall not be construed against any party due to the fact that said Agreement or any Section thereof was drafted by said party.

12.12. Further Action. The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purpose of the Agreement.

12.13. Counterparts. This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto even though all the parties are not signatories to the original or the same counterpart.

12.14. Parties in Interest. Nothing herein shall be construed to be to the benefit of any third party, nor is it intended that any provision shall be for the benefit of any third party.

12.15. Savings Clause. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

12.16. Time of the Essence. The time for performance of the obligations of the parties is of the essence of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

E. BERGMAN CO.

BY _____          Keck Homes LLC
   Eugene Bergman, President          Dealer

GUARANTY

Guarantor unconditionally, except as otherwise defined herein, guarantees the fulfillment of all terms of the Agreement, including the payment of all monies due to the Company, arising from any failure of the Dealer to fulfill the terms of the Agreement.

_____
Guarantor

Prepared By:
DODD & McCLELLAN, P.C.
Attorneys at Law
303 S. Mattis Avenue, Suite 201
Champaign, IL 61821-3051
Telephone: (217) 356-6363
Facsimile: (217) 355-1358
s:\winfiles\bergman\contracts\2000Agreement2

## EXHIBIT A

The Territory is hereby defined as the following county(ies) in the State of <u>Kansas&Missouri</u>

Kansas-1/5 of Johnson and Wyandotte

Missouri-1/5 of Platt, Clay, and Jackson

EXHIBIT "B"

## TRADEMARK LICENSE

This Agreement is effective as of the __28__ day of __April____, 20_01_ by and between E. Bergman Co., doing business as **BORDER MAGIC®**, a corporation organized and existing under the laws of Illinois, located at 1503 CR 2700 N, Rantoul, IL 61866 (hereinafter called "Owner"), and __Keck Homes LLC_____ (hereinafter called "User"), an _____ corporation located at _Blue Springs, Missori_____.

WHEREAS, Owner is the owner of the trademark, service mark and trade name **BORDER MAGIC®** (hereinafter called "Marks"), and

WHEREAS, User is desirous of using the Marks in connection with its business;

NOW THEREFORE, in consideration of the foregoing and of the mutual promises hereinafter set forth, the parties agree as follows:

1.    **GRANT OF LICENSE**

Owner grants to User a nonexclusive, nontransferable license to use the Marks in its name and in connection only with goods and services sold in User's business of providing custom curbing and only from a business location and to customers within the Territory as defined below, and User accepts the License subject to the following terms and conditions.

2.    The Territory is defined as the following county(ies) in the State of __Kansas&Missouri__ _____ _Kansas 1/5 of Johnson and Wyandotte_____. _Missouri 1/5 of Platt, Clay, and Jackson_____

3.    User acknowledges that Owner may grant other licenses to use the Marks, provided that while this Agreement is in full force and effect, no such other license shall be for any area including any portion of the Territory as defined herein.

4.    **OWNERSHIP OF MARKS**

User acknowledges the ownership of the Marks in Owner, agrees that it will do nothing inconsistent with such ownership and that all use of the Marks by User shall inure to the benefit of and be on behalf of Owner, and agrees to assist Owner in recording or filing this Agreement or any other documents or agreement necessary to vest all right, title and interest in the Marks with the Owner with appropriate government authorities. User agrees that nothing in this License shall give User any right, title or interest in the Marks other than the right to use the Marks in accordance with this License and User agrees that it will not attack the title of Owner to the Marks or attack the validity of this License.

5.    **QUALITY STANDARDS**

User agrees that the nature and quality of all services rendered and goods sold by User in connection with the Marks shall conform to standards set by and be under the control of Owner.

6.    **QUALITY MAINTENANCE**

User agrees to cooperate with Owner in facilitating Owner's control of such nature and quality, to permit reasonable inspection of User's operation, and to supply Owner with specimens of use of the Marks upon request. User shall comply with all applicable laws and regulations and obtain all

1

appropriate government approvals pertaining to the sale, distribution and advertising of goods and services covered by this License, if any.

### 7.    FORM OF USE

User agrees to use the Marks only in the form and manner and with appropriate legends as prescribed from time to time by Owner, and not to use any other trademark or service mark in combination with any of the Marks without prior written approval of Owner.

### 8.    INFRINGEMENT PROCEEDINGS

User agrees to notify Owner of any unauthorized use of the Marks by others promptly as it comes to User's attention. Owner shall have the sole right and discretion to bring infringement or unfair competition proceedings involving the Marks.

### 9.    TERM

This Agreement shall continue in full force and effect for as long as User remains in good standing and not in default under the Dealership Agreement between Owner and Dealer dated April 28 , 20 01 and so long as User actively operates a custom curbing business within the territory using the Marks. This Trademark License shall immediately terminate upon termination of the Dealership Agreement or as provided for herein.

### 10.    TERMINATION FOR CAUSE

Owner shall have the right to terminate this Agreement upon thirty (30) days written notice to User in the event of any affirmative act of insolvency by User, or upon the appointment of any receiver or trustee to take possession of the properties of User or upon the winding-up sale, consolidation, merger or any sequestration by governmental authority of User, or upon breach by User of any of the provisions of this Agreement or of the Dealership Agreement.

### 11.    INTERPRETATION OF AGREEMENT

It is agreed that this Agreement shall be interpreted according to the laws of the State of Illinois, United States of America.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

OWNER/USER

E. Bergman Co. / Keck House LLC

(company name)

By _____    By _____
          President
                                    Ken Keck

DODD & McCLELLAN, P.C.
Attorneys at Law
303 S. Mattis Avenue, Ste. 201
Champaign, IL 61821-3051
Telephone: (217) 356-6363
Facsimile: (217) 356-1358      S:\WINFILES\BERGMAN\Contracts\2001 Trademark License

2

04-2154 (MPM)

04- 2154

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS – 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Border Magic LLC and E. Bergman Company d/b/a Border Magic

## DEFENDANTS

Keck Homes LLC and Ken Keck

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Champaign
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Dodd & Bartell, P.C.
303 S. Mattis, Ste. 201
Champaign, IL  61821
(217) 356-6363

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☒ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS – Third Party 26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

| REAL PROPERTY | CIVIL RIGHTS | PRISONER |
|---|---|---|
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   8/6/04

SIGNATURE OF ATTORNEY OF RECORD
_Jon T. Bewell_